## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

PATRICK POE, RACHEL ROE, and VERONICA VOE, individually and on behalf of all others similarly situated,

      Plaintiffs,

v.

DAMIA HARRIS-MADDEN, as Commissioner of the New York State Office of Children and Family Services; KRISTIN GLEESON, as Director of Statewide Central Register of Child Abuse and Maltreatment, and Acting Associate Commissioner of Child Welfare and Community Services; and STEVEN CONNOLLY, as Director of the Bureau of Special Hearings,

      Defendants.

Case No: 1:26-cv-01606

**CLASS ACTION COMPLAINT**

## PRELIMINARY STATEMENT

1.     Every year, thousands of New Yorkers are unnecessarily forced to wait many months, sometimes years, to clear their names from the New York Statewide Central Register of Child Abuse and Maltreatment ("SCR") when there is often no evidence to justify their inclusion. The New York State Office of Children and Family Services ("OCFS") administers the SCR. Although New York law is designed to provide prompt review to parents who allege that they have been improperly included on the SCR, OCFS's policies, practices, and customs delay the prompt correction of erroneously included names. When inclusion of parents and caretakers on the SCR is unwarranted, they unfairly suffer immense injury, including the stigma of alleged child abuse, loss of employment opportunities, and inability to care for family members.

2.      The need for prompt review is undeniable.  The vast majority of parents who challenge their inclusion on the SCR through the SCR appeal process prevail, and their erroneous listing is amended or sealed.  This high rate of success reflects a substantial risk of error that each person on the SCR faces and underlines the urgency of giving parents and other caretakers an opportunity to promptly clear their names.

3.      The unreliability of unproven SCR reports is unsurprising given the overinclusion that permeates the process prior to administrative review.  Every year, the SCR hotline receives over 100,000 reports of suspected mistreatment of a child.  No evidence whatsoever is required to make an allegation that initiates an investigation.  These reports are investigated by under-resourced and under-supervised county child protective services ("CPS") caseworkers who commonly approach reports of abuse or maltreatment with a presumption of wrongdoing.  They credit uncorroborated allegations while disregarding or failing to obtain key evidence.  And a caseworker's decision to make a finding of wrongdoing against a parent—known as "indicating" a report—is frequently rubberstamped by an overextended supervisor driven by institutional risk aversion.  Moreover, CPS caseworkers are empowered to mark reports as indicated—effectively barring the parent from a wide range of employment—without considering, let alone determining, whether the allegations are relevant to working with children.  It is only after a parent or caretaker challenges their report that OCFS considers its relevance to working with children, at which point a substantial portion of reports are determined to be irrelevant and so are sealed.

4.      Notwithstanding the high likelihood that inclusion on the SCR is erroneous, OCFS's policies, customs, practices, and insufficient training and oversight cause protracted and widespread delays in the administrative review process.  Although OCFS is statutorily required to provide parents with a prompt opportunity to challenge their inclusion on the SCR—first through

an administrative review by OCFS and, if necessary, at a Fair Hearing before an OCFS Administrative Law Judge—OCFS routinely disregards the strict timelines mandated by New York law and allows unnecessary and lengthy delays to infiltrate the appeal process.

5.     Plaintiffs' experiences of employment consequences, financial insecurity, and the stigma of inclusion on the SCR exemplify the harms of OCFS's protracted delays in the appeal process.  For example, after being offered a job as a medical caseworker, Plaintiff Patrick Poe, a single Latino father, has been prevented from taking that job for months because the SCR background check has yet to clear, leaving him unable to secure full-time employment.[1]  Plaintiff Rachel Roe, a Black mother raising two daughters, has been unable to obtain paid work in her chosen field of child care while she waits for a determination.  Plaintiff Veronica Voe, a Black single mother of a six-year-old daughter, has forgone applying for multiple jobs while waiting over a year for a determination from OCFS.

6.     Because of widespread delays at every step of the SCR appeal process, thousands of parents languish on the SCR while losing out on employment opportunities and are effectively barred from becoming kinship caregivers without the opportunity to submit evidence and meaningfully challenge their inclusion in the SCR.

7.     OCFS has long been aware of the harms caused by these delays and has repeatedly failed to remedy them.  Over 20 years ago, a group of parents sued OCFS for subjecting them to the same unconstitutional delays in the SCR appeal process.[2]  In a settlement, OCFS committed to reducing wait times for adjudicating indicated SCR reports, but OCFS has continually failed to meet those agreed-upon deadlines since the settlement ended in 2014.

---

[1]     Patrick Poe, Rachel Roe, and Veronica Voe are pseudonyms for the three Named Plaintiffs and are used throughout this Complaint.

[2]     *Finch* v. *N.Y.S. Off. of Child. & Fam. Servs.*, 499 F. Supp. 2d 521 (S.D.N.Y. 2007).

8.     In recent years, advocates have repeatedly alerted Defendants to the harms families suffer because of the lengthy delays in the appeal process. Even so, OCFS has remained indifferent to the extensive delays rather than institute any meaningful changes to its policies, customs, and practices.

9.     The widespread and protracted delays caused by OCFS violate the due process guarantees in the Fourteenth Amendment to the United States Constitution by failing to provide people whose names are listed on the SCR with a timely opportunity to be heard and to correct the harmful infringement of their rights.

10.    Through this action, Plaintiffs seek declaratory and injunctive relief, on behalf of themselves and others similarly situated, to vindicate their due process rights and to end OCFS's widespread violations.

## JURISDICTION AND VENUE

11.    Plaintiffs bring this class action against Defendants pursuant to 42 U.S.C. § 1983 to redress the deprivation of the rights secured to them by the Fourteenth Amendment to the United States Constitution.

12.    This Court has subject matter jurisdiction over Plaintiffs' federal claim under 28 U.S.C. §§ 1331 and 1343(a)(3).

13.    Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b) because Defendants operate in that judicial district, and a substantial part of the events giving rise to Plaintiffs' claims occurred and continue to occur there.

## THE PARTIES

14.    Plaintiff Patrick Poe is a resident of Queens, New York. Mr. Poe was reported to the SCR on November 13, 2023. He never received a notice that he had been placed on the SCR and instead learned about the indicated report in July 2025, when a potential employer initiated a

background check.  On September 9, 2025, Mr. Poe timely requested that the report be amended.
Mr. Poe's Fair Hearing has been scheduled for April 22, 2026, over seven months after his request
to amend the report and nearly two and a half years after the report was indicated.

15.     Plaintiff Rachel Roe is a resident of Queens, New York.  Ms. Roe was reported to
the SCR, and she received a notice that the CPS agency had indicated her SCR report.  She timely
requested that her report be amended, and her Fair Hearing has been scheduled for March 11, 2026,
nearly twelve months after her request to amend the report.

16.     Plaintiff Veronica Voe is a resident of Brooklyn, New York.  Ms. Voe was reported
to the SCR on September 21, 2024.  After learning of her indicated report by letter, Ms. Voe timely
requested that her report be amended on February 3, 2025.  Ms. Voe's Fair Hearing was scheduled
for March 3, 2026, over a year after she learned of her indicated report.

17.     Defendant DaMia Harris-Madden is the Commissioner of OCFS.  Under New York
law, requests to amend indicated reports are submitted to the OCFS Commissioner.  *See* N.Y. Soc.
Serv. Law § 422(8)(a)(i).  As Commissioner, Defendant Harris-Madden is also responsible for
adopting regulations necessary to implement laws relating to the responsibilities of OCFS, has
general supervisory authority for the policies, practices, and operations of OCFS, and plays a key
role in shaping OCFS policy.  *See* N.Y. Soc. Serv. Law §§ 422, 427.  Defendant Harris-Madden
is sued in her official capacity.

18.     Defendant Kristin Gleeson is the Director of the SCR and the Associate
Commissioner of Child Welfare and Community Services for Regional Operations and Practice
Improvement at OCFS.  Defendant Gleeson is responsible for administering policies and practices
relating to the operations of the SCR, which includes maintaining a 24/7 hotline for reports of
suspected child abuse or maltreatment, receiving and processing requests to amend indicated

reports, and conducting administrative reviews of requests to amend indicated reports. Defendant Gleeson is sued in her official capacity.

19.    Defendant Steven Connolly is the Director of the Bureau of Special Hearings, the division of OCFS that provides the forum for hearings arising out of the operations of the SCR. The Bureau of Special Hearings administers hearings through its office in Harlem, New York, for all New York City cases. Defendant Connolly is responsible for establishing and overseeing procedures for administrative hearings conducted by the Bureau, and he is the Chief Administrative Law Judge for the hearings the Bureau conducts. Defendant Connolly is sued in his official capacity.

## FACTUAL ALLEGATIONS

I.    **OCFS'S OVERINCLUSIVE SCREENING PROCESS AND DEFICIENT INVESTIGATIONS BY CPS INCREASE THE RISK OF ERRONEOUSLY INDICATED REPORTS.**

A.    **The Call to the SCR**

20.    OCFS operates the SCR, a centralized database listing the names of all parents[3] in New York with indicated reports of alleged child abuse or maltreatment.[4] State law requires certain employers and licensing agencies, including foster and adoption agencies, to inquire whether potential employees or applicants have indicated reports on the SCR.[5]

---

[3]    Under New York law, a parent, a guardian, or any other adult legally responsible for a child who is alleged to have caused "injury, abuse, or maltreatment" of that child may be reported to the SCR. N.Y. Soc. Serv. Law § 412(4). For readability's sake, this Complaint refers to all such individuals as "parents." The SCR also contains the names of parents who were investigated for abuse or maltreatment and the reports deemed "unfounded." *Id*. § 412(6). Those records are not reported to employers or licensing agencies that conduct SCR checks.

[4]    N.Y. Soc. Serv. Law §§ 422(1), 412(1), 412(2); N.Y. Family Court Act §§ 1012(e), 1012(f).

[5]    N.Y. Soc. Serv. Law § 424-A.

21.     The SCR receives telephone calls alleging child abuse or maltreatment.  Some calls to the SCR are made by "mandatory reporters," *i.e.*, those required to report by law, including physicians, school officials, and law enforcement personnel.[6]  Other calls to the SCR are made by members of the public under no duty to report.[7]

22.     After it receives a report, OCFS determines whether to transmit the report to a local CPS agency for investigation.[8]  OCFS screens out reports at a far lower rate than most other states. State agencies nationwide screen out, on average, about 50.5 percent of hotline reports.[9]  However, OCFS screens out only about 25 percent of reports made to the SCR hotline.[10]

23.     Because no evidence is required to make an allegation that triggers an investigation, the reporting system is often weaponized.  For example, it is well documented that abusive ex-partners harass their victims by repeatedly lodging intentionally false reports of child neglect, including in "contentious custody or visitation case[s]."[11]   Indeed, the prior New York City

---

[6]     N.Y. Soc. Serv. Law § 413(1)(a).

[7]     N.Y. Soc. Serv. Law § 422(2)(a).

[8]     N.Y. Soc. Serv. Law § 422(2)(a).

[9]     For example, in 2022, California agencies screened out 49.7% of reports, Florida agencies screened out 42.8% of reports, Massachusetts agencies screened out 51.9% of reports and Ohio agencies screened out 59.6% of reports.  Children's Bureau, U.S. Department of Health and Human Services, *Child Maltreatment 2022*, Table 2-1 at 13, https://www.acf.hhs.gov/sites/default/files/documents/cb/cm2022.pdf.

[10]     Susanti Sarkar, *New York Child Protection Hotline Accepts Maltreatment Allegations at Far Higher Rates than Other States, New Study Shows*, IMPRINT (Mar. 6, 2024, 3:32 PM), https://imprintnews.org/top-stories/new-york-child-protection-hotline-accepts-maltreatment-allegations-at-far-higher-rates-than-other-states-new-study-shows/247933.

[11]     Louise Feld et al., *When Litigants Cry Wolf: False Reports of Child Maltreatment in Custody Litigation and How to Address Them*, 24 N.Y.U. J. LEGIS. & PUB. POL'Y 111, 111 (2021); *see also* Jonah E. Bromwich & Andy Newman, *Child Abuse Investigators Traumatize Families, Lawsuit Charges*, N.Y. TIMES (Feb. 20, 2024), https://www.nytimes.com/2024/02/20/nyregion/acs-nyc-family-trauma-lawsuit.html; Louise Feld et. al., *When Litigants Cry Wolf: False Reports of Child Maltreatment in Custody Litigation and How to Address Them*, 24 N.Y.U. J. LEGIS. & PUB. POL'Y 111 (2021);  Susanti Sarkar, *Child Welfare Officials in New York Get an Earful on*

Administration for Children's Services ("ACS") Commissioner recognized the problem presented by "false and malicious reporting" to the SCR.

### B.    Flawed Investigations

24.    Over 100,000 reports annually are forwarded to local CPS agencies, including New York City's ACS.  CPS investigates and determines whether the report is indicated or unfounded. A report is "indicated" if the CPS agency determines by a fair preponderance of the evidence that the alleged abuse or maltreatment occurred.[12]  Otherwise, the report is "unfounded."[13]

25.    CPS investigations are conducted by under-resourced and poorly trained caseworkers, many of whom lack prior social work or investigation experience.    These caseworkers receive inadequate supervision.  An audit of ACS found that supervisors did not perform required case reviews on a consistent basis, increasing the risk of flawed investigatory results.[14]

26.    Both caseworkers and supervisors carry caseloads that are too large to ensure adherence to mandated practices.  OCFS says investigating caseworkers should have a caseload of

---

*Hazards of CPS Hotline Practices*, IMPRINT  (Oct. 9, 2024, 7:27 PM), https://imprintnews.org/top-stories/child-welfare-officials-in-new-york-get-an-earful-on-hazards-of-cps-hotline-practices/255428 ("Several parents shared stories of being forced to answer to CPS despite repeated false reports—often made by abusive exes.").

[12]    N.Y. Soc. Serv. Law § 412(7).

[13]    N.Y. Soc. Serv. Law § 412(6).  For investigations commenced prior to January 1, 2022, CPS determined only whether there was "some credible evidence of the alleged abuse or maltreatment."  N.Y. Soc. Serv. L. § 422(5)(a).  Due to OCFS's extreme delays, there could be parents and caretakers who were indicated prior to January 1, 2022 under this lower evidentiary standard who are still undergoing the administrative appeal process.  Unfounded reports are sealed by both OCFS and CPS.  *Id.*

[14]    City of New York, Office of the Comptroller, Audit Report on the Administration for Children's Services' Controls Over Its Investigations of Child Abuse and Neglect Allegations 1-2 (June 15, 2016), https://comptroller.nyc.gov/wp-content/uploads/documents/MG15_061A.pdf. The audit revealed multiple areas within each case reviewed where caseworkers did not adhere to ACS investigatory guidelines and supervisors did not catch these practice deficiencies.  *Id.* at 8–9.

fifteen cases at any given time,[15] but across New York State, CPS caseworkers manage caseloads that far exceed that number.[16]  CPS supervisor caseloads are also high.  One CPS supervisor testified that she "supervised 122 cases," noting "if that doesn't scare you, it should."[17]  Large, unmanageable caseloads make it difficult to meet required deadlines for case disposition, and can cause the investigating caseworker to consider only a narrow range of issues to save time.

---

[15]    *See* Bonadio Group, *Comprehensive Review of the Child Welfare Division of Sullivan County DSS 11* (Oct. 17, 2024).

[16]    This problem exists in many New York counties.  *See* Gregory Bacon, *Staffing Levels at PA a Concern*, Observer Today (Mar. 15, 2024); *Almost 60% of Suffolk CPS Workers Had Caseloads Above Standards Set After Thomas Valva's Death*, Newsday, https://www.newsday.com/long-island/politics/thomas-valva-suffolk-cps-caseloads-qj2hse8s; *CPS Workers May Be Increased to 40 Hours a Week*, Observer Today (Mar. 15, 2024) https://www.observertoday.com/news/top-stories/2024/03/cps-workers-may-be-increased-to-40-hours-a-week/; Mary Kielar, *Report on Oswego County DSS Turns Up Known Issues with Staffing, Large Caseloads*, CNY Central (Feb. 2, 2023, 5:45 PM), https://cnycentral.com/news/i-team/report-on-oswego-county-dss-after-death-of-jordan-brooks-done; *Erie Co. CPS Receives Poor Ranking in Several Areas Compared to Other Counties Statewide*, 7 ABC BUFFALO (Mar. 8, 2017, 6:28 PM), https://www.wkbw.com/news/erie-co-cps-receives-poor-ranking-in-several-areas-compared-to-other-counties-statewide; Jennifer Lewke, *CPS Caseload Sizes at 'Unmanageable Levels' in Monroe County*, NEWS 10 NBC (Apr. 13, 2023, 6:43), https://www.whec.com/uncategorized/cps-caseload-sizes-at-unmanageable-levels-in-monroe-county/; Sandy Torres, *Child Protective Services Workers Ask Lawmakers for Help*, 7NEWSWWNYTV (Apr. 6, 2022, 5:44 PM), https://www.wwnytv.com/2022/04/06/child-protective-services-workers-ask-lawmakers-help/.  In Sullivan County, for example, a 2023-2024 analysis found that 100% of caseworkers had more than 15 cases, and 60% of caseworkers had more than 20 cases. *See supra* note 15.

[17]    Sandy Torres, *Child Protective Services Workers Ask Lawmakers for Help*, 7NEWSWWNYTV (Apr. 6, 2022, 5:44 PM), https://www.wwnytv.com/2022/04/06/child-protective-services-workers-ask-lawmakers-help/; *see also* New York City Office of the Comptroller, Audit Report on the Administration for Children's Services' Controls Over Its Investigations of Child Abuse and Neglect Allegations 12 (June 15, 2016), https://comptroller.nyc.gov/wp-content/uploads/documents/MG15_061A.pdf (noting that ACS case supervisors oversee caseloads of 50 to 60 cases).

27.    Turnover is high among CPS caseworkers, who commonly leave because of high caseloads, inadequate training, poor supervision, and burnout.  Because of frequent turnover, a significant portion of the workforce consists of trainees, driving up caseloads for remaining staff.[18]

28.    Caseworkers routinely fail to interview important sources of information and maintain shoddy recordkeeping practices.  These practice failures lead to the collection of inaccurate and insufficient information.

29.    Caseworkers, who are not required to have a degree related to social work, investigation, or any related field, decide whether the evidence supports indicating a report.  State law requires approval of that decision only by a CPS case supervisor, not by a more senior administrator.[19]  CPS's decision to indicate a report or not is inherently subjective.  Indeed, critical determinations throughout the investigation are left to individual caseworkers' or supervisors' subjective perceptions of risk and safety, and interpretations of ambiguous statutory definitions.[20]

30.    CPS staff operate within what sources describe as a "culture of fear" that can distort decision-making.[21]  This institutional risk aversion leads workers—particularly those with less experience—to err on the side of overinclusion by indicating reports even when the evidence may

---

[18]    Abigail Kramer, *Long Hours, High Caseloads: An Ongoing Surge of Cases Weighs on Child Welfare Workers*, NEW SCHOOL CENTER FOR NEW YORK CITY AFFAIRS, https://www.centernyc.org/long-hours-high-caseloads (last visited Feb. 22, 2026).

[19]    18 N.Y.C.C.R. & R., § 432.2(b)(3)(v).

[20]    *See* Sarah A. Font & Kathryn Maguire-Jack, *Decision-Making in Child Protective Services:  Influences at Multiple Levels of the Social Ecology,* 47 CHILD ABUSE & NEGLECT. 70, 70-82 (Feb. 25, 2015) ("Despite the proliferation of decision-making tools for CPS in recent decades, there remains a great deal of subjectivity in maltreatment screening, investigation, and substantiation decisions.").

[21]    *See* Antwuan Wallace et al., *New York City Administration for Children's Services Racial Equity Participatory Action Research & System Audit: Findings and Opportunities*, NAT'L INNOVATION SERV., 21 (Dec. 2020) (describing "culture of fear" at ACS incentivizing child removal), https://int.nyt.com/data/documenttools/draft-report-of-nyc-administration-for-children-s-services-racial-equity-survey/fc3e7ced070e17a4/full.pdf

not adequately support such determinations.[22]  The result is a pattern of indicating cases without sufficient basis that is driven more by self-protection and organizational pressures than by the evidence in individual cases.

31.    In a significant majority of these cases, CPS determines that there is no safety risk that merits filing a petition in Family Court alleging abuse or maltreatment or seeking to take any measures to protect the children in the home.  The parents, therefore, are left with an indicated record of child abuse or maltreatment that impairs their ability to obtain employment, despite having had no opportunity to contest the allegations in court.[23]

32.    Within seven days of designating a report as indicated, the CPS agency is required to mail a written notification to the parent named in the report.[24]  These Notices of Indication inform the parent of their right to administratively challenge their indicated report.  It is OCFS's policy, custom, or practice that all Notices of Indication are sent via paper mail.  Upon information and belief—as in Mr. Poe's case, described below—many parents never receive the letters informing them of their indicated report and right to review at a Fair Hearing.

33.    Similarly, when an employer or licensing agency inquires to the SCR about a parent who has an indicated report, and the parent has not yet received a Fair Hearing, OCFS sends the

---

[22]    *See* Capacity Bldg. Ctr. for States, *Decision-Making in Child Welfare for Improved Safety Outcomes* 14 (citing study suggesting some CPS caseworkers lack confidence in their skills to differentiate risk and harm and are prone to err "on the side of safety"), https://ncwwi-dms.org/resourcemenu/resource-library/practice-supports/1463-decision-making-in-child-welfare-for-improved-safety-outcomes/file (last visited Feb. 22, 2026).

[23]    For example, in 2022, fewer than seven percent of investigations in New York City led ACS to file petitions against parents or other caretakers in Family Court.  *See* N.Y.C. Council Comm. On Oversight & Investigations, Hearing on Oversight – Operational Challenges in Family Court, N.Y.C. COUNCIL, at 1:05:30 (Apr. 24, 2023), https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=1091239&GUID=8A7EE7BF-4A7E-4A17-989C-44138BCA277C&Options=&Search=. [legistar.council.nyc.gov].

[24]    18 N.Y.C.R.R. § 432.3(k)(1).

parent a letter via paper mail to inform them that they are the subject of an indicated report that will be disclosed to the inquiring employer or licensing agency unless the parent exercises their right to appeal.

## II.    OCFS DEPRIVES THOUSANDS OF INDIVIDUALS OF DUE PROCESS BY DELAYING THE RIGHT TO LEGALLY REQUIRED REVIEW.

### A.    Process for Challenging an Indicated Report

34.    New York law provides two separate opportunities for a parent to appeal an indicated report:  (i) after the parent is first notified of the indicated report; and (ii) in response to a prospective employer's or foster or adoption agency's request for a background check.

35.    In either case, parents have 90 days from the date they receive notice of the indicated report or request for a background check to initiate an appeal with OCFS.[25]  Under OCFS's policies, customs, and practices, to appeal the report, parents must mail a letter to OCFS requesting that it amend or seal the report.  There is no means for parents to submit their requests for appeal electronically.

36.    Upon receiving a letter requesting that a report be amended or sealed, OCFS undertakes an "administrative review" of the indicated report.  OCFS reviews the CPS agency's investigative records and any documents mailed by the parent to determine whether a fair preponderance of the evidence supports the allegation of child abuse or maltreatment; and, if so, whether the allegations are "relevant or reasonably related" to employment in the field of childcare or becoming a foster or adoptive parent.  By law, OCFS has up to 90 days to conduct its initial review.[26]

---

[25]    N.Y. Soc. Serv. Law § 422(8)(a)(i).

[26]    N.Y. Soc. Serv. Law § 422(8)(a)(i).

37. If OCFS finds that the report's allegations are not supported by a fair preponderance of the evidence, OCFS amends the report to "unfounded" and seals it.[27] If OCFS finds that the allegations are supported by a fair preponderance of the evidence, it then determines whether the allegations are relevant and reasonably related to employment in the field of childcare or licensure for adoption or foster parenting.[28] If OCFS deems the allegations not relevant to employment that involves contact with children or to becoming a foster or adoptive parent, the report is sealed.

38. If OCFS finds that the allegations are supported by a fair preponderance of the evidence, then OCFS notifies the parent that it will refer the matter to its Bureau of Special Hearings to schedule a Fair Hearing.

39. If OCFS fails to comply with the statutory timeline and does not complete the administrative review within 90 days, the case must be referred for a Fair Hearing without OCFS's review.[29]

40. Fair Hearings are evidentiary hearings in front of the Bureau of Special Hearings, a division of OCFS. Fair Hearings in New York City are administered through OCFS's office in Harlem, New York. OCFS's New York City-based administrative staff work in the Harlem office, where among other things they handle mail and fax communications with parents. OCFS ALJs hearing cases involving ACS are also based in the Harlem office. OCFS's policies, customs, and practices ordinarily require that before the Fair Hearing, the parent attend an initial conference with an OCFS ALJ within the Bureau of Special Hearings, who will schedule and conduct the hearing, and an attorney for the county CPS agency, who will prosecute the Fair Hearing.

---

[27]    N.Y. Soc. Serv. Law § 422(8)(a)(iii); N.Y. Soc. Serv. Law § 422(8)(e).

[28]    N.Y. Soc. Serv. Law § 422(8)(a)(ii).

[29]    N.Y. Soc. Serv. Law. § 422(8)(b)(i).

Typically, OCFS does not schedule a Fair Hearing until the initial conference occurs, which further prolongs the process.

41.    At the Fair Hearing, CPS has the burden of proving that the allegations of abuse or maltreatment are supported by a fair preponderance of the evidence.[30]  The parties may present witnesses and documentary evidence, cross-examine the opposing side's witnesses, and present opening and closing arguments.  Parents typically represent themselves *pro se* at these proceedings because, while they are permitted to hire their own attorney, they are not entitled to free legal representation and often cannot afford to hire private counsel.

42.    After the Fair Hearing, the ALJ drafts a Fair Hearing decision that is then reviewed and formally issued by OCFS.  After a final determination is issued, OCFS makes any applicable adjustments to amend or seal the initial indicated report in the SCR.  OCFS is required to send a copy of the Fair Hearing decision to the parent, county CPS agency, and the SCR within 60 days after the hearing record is closed if the parent's appeal resulted from an employer's or licensing agency's inquiry, and within 90 days if the parent's appeal was made after the initial indication.[31]

---

[30]    N.Y. Soc. Serv. Law § 422(8)(b)(ii).  If the Fair Hearing was stayed during the pendency of Article 10 family court proceedings, the burden at the Fair Hearing shifts according to the result of the Article 10 proceedings.  If the court in the Article 10 proceedings found that the parent did commit abuse or maltreatment, then at the Fair Hearing, there is an irrebuttable presumption that the allegation is substantiated by a fair preponderance of the evidence.  N.Y. Soc. Serv. Law § 422(8)(b)(ii).  Conversely, if the Article 10 proceedings result in CPS withdrawing the petition, the family court dismissing the petition, or the family court finding on the merits for the parent, there is an irrebuttable presumption that the allegation was not proven by a fair preponderance of the evidence.  N.Y. Soc. Serv. Law § 422(8)(b)(ii).

[31]    18 N.Y.C.R.R. § 434.11(b)(c).

43.     If the ALJ determines that the evidence presented at the Fair Hearing does not support a finding of abuse or maltreatment, OCFS must amend the SCR report to unfounded, order CPS to amend its records, and notify the parent.[32]  The report is then sealed.[33]

44.     If the ALJ finds the allegations are supported by a preponderance of the evidence, the ALJ must then decide whether the allegations are relevant to employment that involves contact with children or licensure for adoptive or foster parenting.[34]  If the ALJ finds that the conduct is not relevant, OCFS must seal the report.[35]

45.     If the ALJ determines that the report is supported by the evidence and relevant to employment that involves contact with children or licensure for adoptive or foster parenting, the parent's SCR record will not be amended or sealed.  OCFS will notify any inquiring employer or adoption or foster agency about the parent's indicated report.[36]

**B.      OCFS's Data Show Unconscionable Delays in Appeals of Indicated Reports.**

46.     OCFS's delays in conducting administrative reviews and Fair Hearings are well documented through its own data.[37]

47.     OCFS data show that from 2020 through mid-2025, in over 8,000 out of the approximately 29,500 cases processed, OCFS took more than a year to conduct its administrative

---

[32]     N.Y. Soc. Serv. Law § 422(8)(c)(i).

[33]     N.Y. Soc. Serv. Law § 422(8)(e).

[34]     *See* N.Y. Soc. Serv. Law § 422(8)(c)(ii).

[35]     *See* N.Y. Soc. Serv. Law § 422(8)(c)(ii).

[36]     N.Y. Soc. Serv. Law § 422(8)(c)(ii).

[37]     In response to a FOIL request relating to the amount of time OCFS takes to hear appeals of indicated reports, in September 2025, OCFS produced certain data covering the period from 2020 through mid-2025.

review, in violation of the 90-day maximum period mandated by law.[38]  Over that same time period, over 10,300 people waited over ten months for OCFS to conduct the review.

48.     Administrative review is just the first step.  If OCFS does not amend or seal an indicated report following its review, the parent must wait for (i) OCFS to schedule and hold an initial appearance conference, (ii) the ALJ to schedule and hold a Fair Hearing, (iii) the ALJ to render a Fair Hearing decision, (iv) OCFS to issue the decision, and (v) OCFS to amend or seal the report.

49.     OCFS's data from 2020 through mid-2025 also show that, after having already waited months or years at the administrative review stage, parents again face substantial delays waiting for the next step of the appeal process, the Fair Hearing.  Of the approximately 20,400 parents who requested and received Fair Hearings, over 4,800 people waited at least a year to receive a Fair Hearing decision.  Over 6,100 people waited over ten months to receive a Fair Hearing decision.  OCFS's data suggest that some parents waited *over seven years* for resolution.

50.     When combining the delays in the administrative review stage with those in the Fair Hearing stage, thousands of parents experienced delays of well over a year or more to obtain a Fair Hearing decision.

51.     OCFS's data show that a vast majority of parents—roughly 70 percent—prevail in amending or sealing their indicated reports after bringing a challenge.  Indeed, in 2021 alone, 73.82 percent of SCR appellants prevailed or prevailed in part—in 688 out of 932 Fair Hearings.[39]

52.     Thus, OCFS's significant delays in administrative reviews and Fair Hearings create a protracted SCR appeal process that leaves parents, including Plaintiffs, at significant risk of

---

[38]     N.Y. Soc. Serv. Law § 422(8)(a)(i).

[39]     Affirmation of Steven Connolly in Support of Amended Answer, ¶¶ 37–38, *Jeter* v. *Poole* (Sup. Ct. Apr. 27, 2022).

erroneous deprivation of their constitutional rights while their appeals languish before OCFS reviewers and ALJs.

## III.    PLAINTIFFS' AND OTHER PARENTS' EXPERIENCES OF SCR DELAYS

### A.    Plaintiff Patrick Poe

53.    Mr. Poe is a 45-year-old, Latino father who resides in Queens, New York.  He has two children, aged 10 and 7, and shares custody of them with his ex-wife.

54.    Mr. Poe faces an unreasonable delay in receiving a Fair Hearing decision after submitting his SCR review request.

55.    In November 2023, Mr. Poe met his children in front of his ex-wife's home after school, intending to take the children to a nearby park.  Before they could leave, Mr. Poe's ex-wife attempted to take away his son's scooter, which was lying on the ground nearby.  Mr. Poe then tried to take the scooter back for his son.  After they briefly struggled over the scooter, she let it go, and Mr. Poe took his children to the park.  Later, his ex-wife unexpectedly arrived at the park and tried to forcibly take the scooter once again.

56.    That same month, unbeknownst to Mr. Poe, the New York City Administration for Children's Services ("ACS") conducted an investigation and indicated an SCR report against him after an anonymous report alleged that he had a physical confrontation with his ex-wife in front of his children related to the scooter.  ACS never spoke with Mr. Poe in the course of its investigation.  ACS did not remove Mr. Poe's children from his care or file a petition in Family Court.  Nonetheless, in December 2023, ACS indicated the report.  Mr. Poe did not receive notice of the indication.

57.    Mr. Poe learned about his indicated report over one year later, in July 2025, after he accepted a position as a medical caseworker and his prospective employer conducted a background check.  Mr. Poe was baffled to learn that he had an indicated report.

58.    On September 9, 2025, Mr. Poe timely requested that his report be amended to unfounded or sealed.  On October 7, 2025, OCFS denied his request after administrative review. His Fair Hearing has been scheduled for April 22, 2026, over seven months after his request to amend the report and nearly two and a half years after the report was indicated.

59.    While awaiting resolution of his appeal, Mr. Poe has been unable to secure full-time employment.  Because his background check is still pending, he cannot begin the position he was offered as a medical caseworker.  He fears that he will lose that position altogether because his SCR matter has taken so long to resolve.

**B.    Plaintiff Rachel Roe**

60.    Ms. Roe is a 46-year-old Black mother who resides in Queens, New York, with her two daughters, aged 20 and 14, who rely on her for financial support.  She is currently enrolled at Borough of Manhattan Community College, studying early childhood education in pursuit of her dream to become a teacher.

61.    Ms. Roe will suffer a delay of over one year to receive a Fair Hearing decision after submitting her SCR review request.

62.    In September 2024, Ms. Roe began working as an assistant teacher at a daycare center in Harlem, New York, where she worked successfully for over five months.

63.    On February 6, 2025, one child at the daycare swung at another child.  Ms. Roe attempted to separate the children, to prevent one child from hitting the other child.  During the intervention, one child fell to the ground.  Another assistant teacher witnessed the interaction and reported it to a program director, who reported the incident to the SCR.

64.    ACS investigated the report and determined there were no visible injuries to the child who had fallen.  Nevertheless, OCFS indicated the report.

65.     Ms. Roe timely requested on March 26, 2025 that her report be amended to unfounded or sealed.  OCFS acknowledged receipt of Ms. Roe's request for amendment on March 31, 2025.  Ms. Roe's Fair Hearing has been scheduled for March 11, 2026, nearly twelve months after her initial request to amend her report, and eight months after her initial appearance conference.

66.     Ms. Roe has endured significant financial and emotional hardship while awaiting resolution of her appeal.  Since Ms. Roe was listed on the SCR, she has suffered financial hardship to support her daughters.  The indicated SCR report effectively bars Ms. Roe from employment with licensed daycare providers and has severely limited her employment prospects.  Ms. Roe has spent years training to work in the field of early childhood education at a licensed provider.  Over the past year, Ms. Roe has foregone multiple job opportunities for positions working with children because she reasonably understood that the required background check would preclude her hiring. She had applied for a job with the New York City Department of Education but withdrew her application after learning that her indicated SCR report might be discovered.  Ms. Roe has been unable to apply for paid work in her chosen field of childcare due to her indicated report.

### C.     Plaintiff Veronica Voe

67.     Ms. Voe is a 28-year-old Black mother who resides in Brooklyn, New York.  She currently works for New York City as a "311" information specialist while attending school to become a paralegal.  She has a six-year-old daughter.

68.     Ms. Voe has suffered a delay of over one year to receive a Fair Hearing decision after submitting her SCR review request.

69.     On September 21, 2024, Ms. Voe went to a laundromat two minutes away from her apartment.  Ms. Voe entrusted her boyfriend to care for her daughter while she did the laundry.  At the laundromat, a man began harassing Ms. Voe, so she called 911 and notified her boyfriend out

of fear for her safety.  Ms. Voe's boyfriend believed she was in immediate danger and rushed to the laundromat to provide assistance, briefly leaving Ms. Voe's daughter alone.  When Ms. Voe saw her boyfriend at the laundromat, she immediately reprimanded him for leaving her daughter at home.  Meanwhile, after her boyfriend left the apartment, Ms. Voe's probation officer stopped by.  The probation officer discovered Ms. Voe's daughter home alone but unharmed.

70.    Though there was no evidence of physical or emotional harm to Ms. Voe's daughter, the incident was reported to the SCR, and ACS began an investigation.  ACS asked Ms. Voe to participate in a parenting class, which she promptly completed.  ACS did not remove Ms. Voe's daughter from her care or file a petition in Family Court.  Nonetheless, ACS marked the report against Ms. Voe "indicated" in the SCR.

71.    On February 3, 2025, Ms. Voe timely requested that her report be amended to unfounded and sealed.  On March 6, 2025, OCFS notified Ms. Voe that it had denied her request after administrative review.  Ms. Voe's Fair Hearing was scheduled for March 3, 2026.  Ms. Voe has now been waiting for over a year from the date she requested amendment for her Fair Hearing decision.

72.    Ms. Voe has experienced significant harm as a result of the protracted SCR appeal process.  Prior to Ms. Voe's indicated report, she provided part-time childcare services to support herself and her daughter, advertising her services on online applications such as care.com and sittercity.com.  Knowing that her indicated SCR report will appear in many employers' background checks, she has foregone numerous job opportunities to support herself while she attends school.  She has declined to apply for over a dozen positions in pediatric, medical, and dental offices because the application stated that a "background check" was required for employment, and she worried that a background check would reveal her indicated report.

73.     While Ms. Voe awaits resolution of her SCR appeal, she continues to suffer economic harm, including the loss of employment opportunities.

**D.     Witness C.C.**

74.     In addition to the Plaintiffs, thousands of other parents have experienced significant SCR appeal delays and attendant harms.

75.     Ms. C.C. is a 39-year-old woman who resides in Queens, New York, with her 10-year-old daughter.  Ms. C.C. works as a set dresser in the film and television industry.

76.     Ms. C.C. and her daughter's father, Mr. A.C., have disputed custody over their daughter since they separated in 2018.

77.     On May 30, 2023, when Ms. C.C. arrived outside of Mr. A.C.'s home to take her daughter home, she became involved in a physical altercation with Mr. A.C.'s girlfriend. Ms. C.C.'s daughter was inside and did not witness the interaction.

78.     On June 28, 2023, ACS indicated a report against Ms. C.C.  Ms. C.C. timely requested that her indicated report be amended on July 17, 2023.  Two months later, on September 28, 2023, Ms. C.C. received a letter from OCFS acknowledging her appeal.  On November 8, 2023, OCFS notified Ms. C.C. that her appeal had been denied after administrative review.  Her Fair Hearing was scheduled for March 26, 2024, over eight months after she requested amendment.

79.     On June 25, 2024, approximately one year after her initial request, Ms. C.C. received her Fair Hearing decision, which found that ACS did not establish by a fair preponderance of the evidence that Ms. C.C. had abused or maltreated her daughter.

80.     Ms. C.C.'s near-year-long wait for her SCR appeal to be resolved resulted in lost employment opportunities and adverse impacts on her then-pending custody case.  Because many film sets involve working with children, Ms. C.C. understood that it was standard practice for employers in her industry to run SCR background checks on job applicants.  Ms. C.C. feared that

-21-

she might be fired or denied employment if a production company learned that her name was on the SCR. She also feared that if one production company learned she was on the SCR, the information might spread and tag her with a negative reputation that would affect her ability to obtain positions even after her name was cleared. Consequently, Ms. C.C. did not apply for numerous set dressing positions while she awaited a decision on her SCR appeal. Foregoing these job opportunities cost her tens of thousands of dollars in potential wages.

### E.    Witness L.B.H.

81.    Ms. L.B.H. is a 61-year-old Latina woman who resides in Poughkeepsie, New York, with two of her grandchildren and her great-grandchild. Ms. L.B.H. suffers from chronic medical conditions, including complications from congestive heart failure and immunosuppression.

82.    Ms. L.B.H. has been the subject of three SCR reports, which were made on December 11, 2018, April 26, 2019, and April 22, 2020. Each of the reports alleged that she was an inadequate caregiver for three of her grandchildren—one of whom does not live with her—because of her home's condition. The latter two SCR indicated reports were for not "keep[ing] the home tidy."

83.    After receiving notice of the indicated reports, Ms. L.B.H. requested that OCFS amend them: (i) on April 7, 2019, for her first report, (ii) on June 11, 2019, for her second report, and (iii) on June 15, 2020, for her third report. For each report, OCFS denied her requests to amend following administrative review. On October 7, 2020, Ms. L.B.H. attended an initial appearance conference with an ALJ. Her Fair Hearing was scheduled and rescheduled multiple times. Several of the adjournments were at the request of the counsel for CPS; on a few occasions, Ms. L.B.H. rescheduled the hearing due to illness. Ms. L.B.H.'s Fair Hearing was finally held on May 17, 2023, more than two and a half years after her initial appearance conference.

84.    For the next year and a half, Ms. L.B.H. awaited a Fair Hearing decision.  Between September 2023 and September 2024, Ms. L.B.H.'s attorney contacted the ALJ five times in attempts to obtain the decision.

85.    Finally, on December 13, 2024, after 576 days of waiting for a decision, and over five years after receiving her first Notice of Indication, Ms. L.B.H. filed an Article 78 petition in state court, requesting that the ALJ be ordered to issue a Fair Hearing decision.  Ten days after she filed the Article 78 petition, the ALJ issued a Fair Hearing decision sealing all the indicated reports because the allegations regarding the conditions in Ms. L.B.H.'s home were not relevant to her ability to care for children.

86.    During this protracted appeal process, Ms. L.B.H. suffered significant distress, anxiety, and low self-esteem.  She often woke up in the middle of the night worrying that the indicated reports would adversely affect her ability to care for her grandchildren, who had lived with her since May 2007.  These children had no one else to care for them.  She also worried that her granddaughter would be penalized for living with her when she gave birth to Ms. L.B.H.'s great-grandchild.

## IV.    OCFS'S DELAYS HARM NEW YORKERS AND THEIR FAMILIES.

87.    As the Second Circuit has made clear, inclusion on the SCR infringes on parents' constitutionally protected liberty interests under the Fourteenth Amendment because it impedes their ability to obtain employment.[40]  OCFS's delays in processing SCR appeals unreasonably prolong the deprivation of parents' liberty interests, rendering this deprivation unconstitutional.

---

[40]    *See Valmonte* v. *Bane*, 18 F.3d 992, 1002 (2d Cir. 1994) (holding that the right to challenge indicated SCR reports implicates Plaintiffs' protected liberty interests "not merely because of the defamatory aspect of the Central Register, but because that defamation occurs in conjunction with a statutory impediment to employment" and that OCFS was violating parents' procedural due process rights to pre-deprivation hearings); *see also Matter of Lee TT.* v. *Dowling*, 87 N.Y.2d 699, 710 (1996) (holding that "inclusion of petitioners in the Central Register not only harmed their

88.    OCFS's unconstitutional infringement of parents' liberty interests through protracted SCR appeal delays is all the more egregious because a vast majority of parents who challenge their indicated reports—roughly 70 percent—ultimately prevail in having their reports amended or sealed, suggesting that many parents are needlessly subjected to OCFS's delays and the associated harms.

89.    Low-income families and Black and Latino parents—like Plaintiffs—shoulder a disproportionate share of these delays and harms.  These communities are overreported to the SCR. For example, in 2022 alone, a Black child in New York City was seven times more likely than a white child to be involved in a CPS investigation.[41]  One out of every two Black children in New York City has been the subject of an investigation by the time they reach the age of 18.[42]  And individuals living in New York City communities with the highest rates of poverty are four times more likely to be reported to the SCR and subsequently investigated than persons living in districts with low poverty rates.[43]

---

personal reputations, it affected their present employment and effectively foreclosed them from any future employment" and that OCFS was violating parents' procedural due process rights to pre-deprivation hearings).

[41]    ACS, Administration for Children's Services, NYC Public Schools & New York State Office of Children and Family Services Announce Strategies to Address Racial Disproportionality in the Child Welfare System, Oct. 19, 2023, https://www.nyc.gov/assets/acs/pdf/PressReleases/2023/address-racial-disproportionality.pdf

[42]    ACS, Administration for Children's Services, NYC Public Schools & New York State Office of Children and Family Services Announce Strategies to Address Racial Disproportionality in the Child Welfare System, Oct. 19, 2023, https://www.nyc.gov/assets/acs/pdf/PressReleases/2023/address-racial-disproportionality.pdf

[43]    U.S. Commission on Civil Rights, Examining the New York Child Welfare System and Its Impact on Black Children and Families, at 40, (May 2024), https://www.usccr.gov/files/2024-05/ny-child-welfare-system-sac-report.pdf.

A.    **OCFS's SCR Appeal Delays Impair the Protected Liberty Interests of Parents Who Cannot Obtain Employment in Their Chosen Fields.**

90.    As a result of SCR appeal delays and uncertainty regarding their ability to work with children, Plaintiffs have been unable to secure suitable employment in their intended fields or make reliable plans for their future educational or career opportunities.

91.    When a parent like one of the Plaintiffs, or Ms. C.C., applies for a job that could involve contact with children, the employer is mandated by law to ask OCFS for an SCR background check to determine whether the applicant has an indicated report.[44]  Employers must also seek an SCR background check for certain roles that do not involve working with children, such as positions that involve working with disabled adults.

92.    After receiving an SCR inquiry from a prospective employer, OCFS must offer the person whose report is indicated in the SCR an administrative review and Fair Hearing, as in the case of Mr. Poe.  During the months or years it takes the parent to have their indicated report amended or sealed, OCFS does not respond to the employer's inquiry.

93.    On information and belief, because OCFS responds to employer inquiries when there is no indicated report, employers—who routinely make SCR inquiries—frequently interpret OCFS's silence as confirmation that an indicated report exists.  In such instances, employers frequently assume the parent has an indicated case and refuse to hire the parent while waiting for word from OCFS, which does not come until the appeal process is completed.

94.    Parents appealing indicated reports, including Plaintiffs and Ms. C.C., have reasonably refrained from applying for jobs for which they are otherwise qualified because they

---

[44]    N.Y. Soc. Serv. Law § 424-a(3) (employers that must request background check include preschools; residential schools; juvenile detention centers; facilities that provide health home services to those with developmental disabilities or individuals under 21; and publicly funded emergency shelters for families).

know they will not be hired until their reports are amended or sealed.  Other parents are asked to explain the delay in SCR's response or sign a release for the employer to obtain a copy of the parent's entire SCR record.

95.    OCFS's delays are especially harmful to Black and Latina women, such as Ms. Roe and Ms. Voe, and their families, as Black and Latina women are more likely than other populations to work in, and apply for, childcare and healthcare jobs that require clearance from the SCR. SCR background checks are required for a wide range of employers, including daycares, schools, camps, group homes for disabled adults or the elderly, and hospitals.[45]

> **B.    OCFS's Delays Impair the Protected Liberty Interests of Parents Who Are Denied the Opportunity to Adopt or Foster Children.**

96.    Parents who are named in indicated reports also face challenges when seeking to adopt or foster children, including children from their own families.

97.    Extended family members—grandparents, aunts, uncles, and cousins—serve as the primary guardians or caregivers for nearly 195,000 children in New York.[46]  Research shows that these placements are beneficial because children in kinship foster care experience fewer behavioral problems, mental health disorders, and placement disruptions than children in non-kinship foster care.[47]

---

[45]    N.Y. Soc. Serv. Law § 424-a(1)(a).

[46]    Erik Kriss, *Non-Parent Relatives & Family Friends Caring for Children Gain Legal Standing in NYS as "Kinship Caregivers"*, AARP (July 21, 2021), https://states.aarp.org/new-york/non-parent-relatives-family-friends-caring-for-children-gain-legal-standing-in-nys-as-kinship-caregivers.

[47]    Marc Winokur, et al, *Kinship Care for the Safety, Permanency, and Well-Being of Children Removed from the Home for Maltreatment*, COCHRANE DATABASE OF SYSTEMATIC REVIEWS 2014, Issue 1, https://pmc.ncbi.nlm.nih.gov/articles/PMC7386884/pdf/CD006546.pdf.

98.    Due to the widely recognized positive impact on children, federal and state laws include a strong preference for kinship care.[48]

99.    By state law, foster and adoption agencies must ask OCFS whether kinship foster caregiver applicants, and any other adults who live in their homes, are the subject of indicated reports.

100.    Foster and adoptive agencies routinely reject applicants because they, or adults who live in the applicants' homes, have indicated reports.

101.    By failing to timely adjudicate SCR appeals, Defendants deny individuals with indicated reports these caregiving opportunities and deny children the opportunity to live with extended family members, even if Family Court judges determine it is in the child's best interests and even though kinship placements are more likely to preserve vital relationships and support the child's well-being and development.

102.    Because Black and Latino children are vastly overrepresented in New York's foster care system, kinship placement denials due to indicated reports have a disproportionate impact on Black and Latino families.

## V.    DEFENDANTS ARE AWARE THAT OCFS'S POLICIES, CUSTOMS, AND PRACTICES CAUSE UNCONSTITUTIONAL DELAYS IN PROCESSING APPEALS OF INDICATED REPORTS.

103.    For years, Defendants have failed to meet their legal obligations to timely resolve requests to amend indicated reports.  Defendants are well aware of these delays.

---

[48]    N.Y. Soc. Serv. Law § 398(16).

104.    OCFS itself possesses data showing the length of time it takes for an appeal to proceed through administrative review and Fair Hearing.  Further, OCFS has been sued multiple times over SCR appeal delays.[49]

105.    Advocates have repeatedly met with OCFS to propose ways in which OCFS can remediate these harmful delays.

106.    Despite knowing that these delays are widespread and longstanding, Defendants have failed to take effective action.

**A.    Defendants Are Aware of Prior Litigation Accusing OCFS of Unconstitutional Delays.**

107.    This is not the first time that OCFS has been accused of unconstitutional delays in the SCR appeal process.  In 2004, in *Finch* v. *New York State Office of Children and Family Services*, 499 F. Supp. 2d 521 (S.D.N.Y. 2007), plaintiffs named in indicated SCR reports brought a class action against the then-Commissioner of OCFS and the then-Director of the SCR, seeking injunctive relief based on undue delays in the processing of Fair Hearing requests.

108.    Like Plaintiffs today, the *Finch* plaintiffs alleged that OCFS's delays in resolving their appeals from indicated reports caused them to miss out on employment and kinship caretaking opportunities, and denied them due process guaranteed by the Fourteenth Amendment. At summary judgment, the *Finch* plaintiffs also "made a strong showing of the high risk of erroneous deprivation" from appeal delays.[50]  The *Finch* court found that, in 2008, the sealing rate

---

[49]    *See, e.g.*, *Finch* v. *N.Y.S. Off. of Child. & Fam. Servs.*, 499 F. Supp. 2d 521 (S.D.N.Y. 2007); *Worrell* v. *City of New York*, 2014 WL 1224257 (E.D.N.Y. Mar. 24, 2014); *Tafuto* v. *New York State Off. for Child. & Fam. Servs.*, 2012 WL 4459803 (S.D.N.Y. Sept. 25, 2012).

[50]    *Finch* v. *N.Y.S Off. Of Child. & Fam. Servs.*, 1:044-cv-01668, ECF No. 67 at 9 (S.D.N.Y. Dec. 18, 2008).

for parents challenging indicated reports was 74 percent—almost exactly the same percentage of parents who, according to Defendant Connolly, prevailed in 2021.[51]

109.    During the course of the *Finch* litigation, an OCFS whistleblower revealed that OCFS had regularly shredded SCR appellants' Fair Hearing requests and then designated the SCR appellants' cases as "waived" or "withdrawn."[52]

110.    The parties settled the *Finch* action, and OCFS agreed to improve its processing times.  Since the settlement ended in February 2014, however, delays in administrative reviews and scheduling of Fair Hearings have again become prevalent.  In thousands of SCR appeals since 2020, OCFS has ignored the time frames it promised to meet in the *Finch* settlement.

111.    Following *Finch*, individual plaintiffs have brought lawsuits alleging harms caused by OCFS's SCR appeal delays.[53]  The lawsuits filed since the *Finch* litigation demonstrate Defendants' awareness of and indifference to the lengthy delays in the SCR appeal process and the harms to parents and families from those delays.

---

[51]    *Id.*

[52]    John O'Brien, *NY Denied Thousands Accused of Child Abuse the Chance to Clear Their Name*, SYRACUSE (Mar. 22, 2010), https://www.syracuse.com/news/2010/03/ny_denied_thousands_accused_of.html.

[53]    *See, e.g.*, *Estiverne* v. *Esernio-Jenssen*, 908 F. Supp.2d 305, 308 (E.D.N.Y. 2012) (recognizing that OCFS's "delay in responding to the [plaintiff's employer] would clearly put it on notice of an indicated report and would therefore affect plaintiff's liberty interest in pursuing her chosen profession"); *Hernandez* v. *Michael*, 2025 N.Y. Slip Op., Dkt. No. 28, Case No. 2024-55805 (Sup. Ct. Feb. 6, 2025) (plaintiff petitioned for mandamus after OCFS ALJ did not issue decision for almost 19 months after Fair Hearing); *Worrell* v. *City of New York*, 2014 WL 1224257, at *1 n.1, *2 (E.D.N.Y. Mar. 24, 2014) (plaintiff had filed a complaint against OCFS alleging that "lengthy delay violated her due process rights by denying her the right to a fair hearing"); *Tafuto* v. *N.Y.S. Off. of Child. & Fam. Servs*, 2012 WL 4459803, at *3 (S.D.N.Y. Sept. 25, 2012) (explaining that plaintiff had asserted "that the delay in providing her a hearing was violative of her due process rights").

**B.      Family Defense Advocates Have Asked OCFS to Ameliorate Harmful Delays.**

112.    Since 2018, family defense advocates have met with OCFS officials at least six times to discuss the resurgent delays in the appeal process and how they impact parents and families.  During these meetings, and in multiple letters, advocates provided OCFS with proposals for process improvements to reduce delays, including the creation of target timelines for different phases of the review process, and offered to work with OCFS to implement these proposals.

113.    On November 30, 2019, the advocates sent OCFS examples of cases that exemplify these problems, including cases with lengthy delays in the time OCFS took to complete the administrative review process, and cases with significant additional delays in getting Fair Hearings scheduled and obtaining decisions after those hearings.

114.    On June 24, 2020, the advocates met virtually with OCFS staff and discussed process improvements, such as improving OCFS's Fair Hearing discovery procedures and instituting electronic methods for communications with parents and counsel.

115.    In summer 2022, the advocates met again with OCFS staff, including Defendant Connolly, and proposed meeting in collaborative subgroups to work together to reduce delays in SCR proceedings.  Though a subsequent meeting with Defendant Connolly was eventually held on February 26, 2024, the meeting did not result in any initiatives to reduce these delays.

116.    On August 15, 2023, and on October 27, 2023, advocates met again with OCFS staff to raise issues with the SCR appeal process.  In both of these meetings, the advocates proposed that OCFS create target timeframes for different phases of the appeal process and track its compliance with those timeframes.  On information and belief, OCFS has not created any such target timeframes.

117.    In 2025, the advocates contacted OCFS several times—on February 12, March 28, and May 15—to ask OCFS to share a prepared list of non-profit legal providers with unrepresented

SCR appellants so that more appellants can be connected to legal counsel. OCFS has not responded to those inquiries.

118.    OCFS has refused to implement most of the suggestions proposed by these advocates, and the SCR appeal process continues to be plagued with significant delays.

119.    On February 24, 2026, some of these family defense advocates sent a letter to Defendants reiterating the problems with the SCR appeal process.[54]

## VI.    DEFENDANTS HAVE FAILED TO REMEDY THE UNCONSTITUTIONAL DELAYS AND CONTINUE TO EXACERBATE THEM.

120.    By screening out calls to the SCR hotline at a far lower rate than other states, OCFS inundates the local CPS agencies with a massive number of reports that need to be investigated, often resulting in erroneous determinations that can be remedied only after a lengthy delay.

121.    OCFS's policies, customs, and practices create delays in processing SCR appeals in at least three ways.

122.    *First*, OCFS's insistence on slow, burdensome, and unreliable communication with parents and caregivers—including by relying on paper mail systems—invites delay.

123.    *Second*, OCFS fails to train its staff to follow statutory timelines and to properly apply standards of review, resulting in staff regularly missing deadlines and upholding indicated designations for cases that will later be amended or sealed.

124.    *Third*, OCFS's policies, customs, and practices for scheduling and administering Fair Hearings and issuing decisions are exceptionally inefficient and cause further delays.

---

[54]    Letter from Christine Gottlieb, NYU Family Defense Clinic/Washington Square Legal Services et al to DaMia Harris Madden, New York State Office of Children and Family Services et al (Feb. 24, 2026) (https://static1.squarespace.com/static/61e433b8f098d83c2489a38a/t/699dd3f8848d217370a77503/1771951096391/Letter+to+OCFS+02+24+26.pdf).

Through these policies, customs, and practices, OCFS creates and exacerbates delays in the adjudication of SCR appeals.

### A. OCFS's SCR Intake and Screening Procedures Overwhelm CPS Agencies, Leading to a Glut of Erroneously Indicated Reports.

125.    At the outset, OCFS's historical encouragement of over-reporting strains CPS agency resources.  As then-Deputy Commissioner of OCFS Lisa Ghartey Ogundimu recognized in June 2023, "mandated reporter training . . . has historically messaged, 'When in doubt, call the [SCR].'"  This has resulted "in a huge influx of reports."  Yet, allegations from mandatory reporters are often unsubstantiated.

126.    Although OCFS is supposed to screen out reports that should not be investigated, it screens out far fewer reports than do other states.  On average, state agencies screen out about 50.5 percent of analogous hotline reports.  However, OCFS screens out only about 25 percent of reports made to the SCR hotline.[55]

### B. OCFS's Inadequate and Inefficient Customs, Practices, and Policies for Communicating with Parents Who Are Named in SCR Reports Create Unnecessary Delay.

127.    OCFS's policy, custom, or practice is to communicate with parents about the reports made against them, including information about their administrative reviews and Fair Hearings, almost exclusively via paper mail, which exacerbates delays.  To make matters worse, OCFS fails to ensure that these critical communications are timely sent and actually received by parents, or translated into the language they read, often leaving parents in the dark about the status of their reports and appeals.

---

[55]    *See supra* note 10.

128.    OCFS policy requires investigating CPS agencies to mail a parent a Notice of Indication letter.  OCFS fails to ensure that CPS agencies actually comply with this requirement. Parents like Mr. Poe regularly do not receive these notices or receive them significantly later than legally required.  This issue is particularly acute for individuals without permanent addresses, such as those facing housing insecurity or living in temporary housing.

129.    When parents do not receive their Notice of Indication, the parents may never even know that a report has been indicated against them until they apply for a job requiring an SCR check, as in the case of Mr. Poe.  Only then, after facing the shame and hardship of being unable to obtain SCR clearance for a new job, will a parent learn of the report indicated against them. This dramatically delays when the parent can request and complete the appeal process.

130.    OCFS's insistence on paper mail communication permeates the review process. After receiving the Notice of Indication, OCFS's policy, custom, or practice is to require the parent to mail their request to amend or seal the indicated report to OCFS.  OCFS sends a letter to confirm receipt.  Later, after completing its administrative review, OCFS sends another letter to share the results of its review with the parent.  If the review is denied, OCFS then sends a separate letter notifying the parent of the scheduled date for an initial appearance conference.  When the parent's Fair Hearing is scheduled, OCFS sends yet another letter to notify them of the Fair Hearing date. When the Fair Hearing decision finally becomes available, OCFS mails a copy of it to the parent. Any one of these letters can be, and often is, undelivered, or untimely delivered, due to OCFS errors or simply because of the inherent risk that paper mail can be lost or delayed.

131.    Parents and advocates have repeatedly requested that OCFS implement an electronic docketing and communication system to reduce the risk of undue delays and other

burdens associated with OCFS's archaic paper-based system.  To date, OCFS has insisted on maintaining its policy, custom, or practice of using paper mail to communicate with parents.[56]

### C. OCFS's Failure to Adequately Train and Supervise Staff Leads to Untimely Administrative Reviews and Fair Hearings.

132.  OCFS's training and supervision practices further foster unconstitutional delays in processing SCR appeals of indicated reports.  OCFS's failure to train and supervise its staff creates a backlog of SCR appeals.  In particular, OCFS staff conducting administrative reviews routinely affirm indicated reports that ALJs later decide should be amended to unfounded or sealed, sending an inappropriately high number of appeals to Fair Hearings, thereby creating a bottleneck that further delays the Fair Hearing process.  Many of the appeals that are denied at administrative review never even go to a hearing because the CPS agency determines the case should not be prosecuted.  Typically, these determinations are not made until many months, and sometimes years, after the administrative review.

133.  As the Director of the SCR, Defendant Gleeson has direct supervisory authority over OCFS administrative reviewers.  As the Director of the Bureau of Special Hearings, Defendant Connolly has direct supervisory authority over the ALJs who conduct Fair Hearings.

134.  If Defendants properly trained administrative reviewers to apply the correct standards of review, the administrative reviewers would properly dispose of significantly more cases.  There would then be far fewer referrals for Fair Hearings, allowing ALJs to timely manage and decide the cases that actually require adjudication.

---

[56]    When parents are represented by an attorney, the ALJ and CPS attorneys will sometimes communicate with the attorney via email once OCFS has referred the case to the Bureau of Special Hearings.  This creates a significant disparity between represented and *pro se* SCR appellants, with the latter stuck using an archaic paper mail-only communication system, which regularly leads to more protracted processing timelines.

135.    Defendants have also failed to train and supervise staff to ensure compliance with statutorily mandated timelines.  OCFS and CPS agencies working under OCFS's supervision are subject to statutory and regulatory deadlines that they regularly fail to meet.  For example, when OCFS initiates an administrative review, CPS is required to forward all investigative and family court records to OCFS within 20 working days.[57]

136.    However, OCFS's staff regularly allow CPS to flout this statutory timeline, leading to untimely administrative reviews.  Similarly, when parents or caregivers request that a report be amended or sealed, they are entitled to a Fair Hearing if OCFS does not amend the report within 90 days, regardless of whether the administrative review is complete.[58]  Nevertheless, OCFS routinely fails to schedule Fair Hearings at the end of the 90-day period, instead allowing administrative review to drag on for months—in clear violation of the statutory timeline.

137.    Similarly, after a Fair Hearing has occurred, regulations require OCFS to draft and send a Fair Hearing decision to the parent, CPS, and the SCR within 60 to 90 days, depending on the type of hearing.[59]  However, on information and belief, OCFS's policy, custom, or practice is to allow ALJs and the OCFS staff who review their decisions to ignore these deadlines, resulting in protracted delays, like those in Ms. L.B.H.'s appeal.

138.    Defendants are aware of the delays caused by their custom of failing to train and supervise.  Defendants are also aware that the delays will have employment consequences for parents trying to clear their names and prevent them from being licensed to adopt or to serve as

---

[57]    *See* N.Y. Soc. Serv. Law § 422(8)(a)(ii).

[58]    *See* N.Y. Soc. Serv. Law § 422(8)(b)(i).

[59]    *See* 18 N.Y.C.R.R. § 434.11(b)(c) (requiring Fair Hearing decision to be mailed to appellant 60 days after hearing record is closed where the hearing is the result of an SCR background check, and 90 days where the hearing is to challenge an indicated report).

foster parents. But Defendants have failed to rectify these deficiencies to improve OCFS's processing timelines. Defendants know the dates on which administrative reviews begin and end, the dates on which Fair Hearings are held and on which decisions are issued, the outcomes of those decisions, and the dates on which OCFS seals reports after the ALJ determines a report is unfounded. On information and belief, despite tracking this information, Defendants fail to use this data to train and supervise OCFS staff to efficiently process cases.

**D.    OCFS's Policies, Customs, and Practices for Administering Fair Hearings Cause Extensive Delays.**

139.    Upon completing the administrative review process, parents may experience delays in having their cases timely scheduled for initial conferences and Fair Hearings, further contributing to the delays in resolving a parent's appeal.

140.    Once parents reach the Fair Hearing stage, they still may face delays upwards of a year before receiving final Fair Hearing decisions.

141.    Even though most OCFS ALJs insist on holding initial conferences, these conferences are often little more than instruments of further delay. OCFS waits between issuing its administrative review decisions and scheduling initial conferences, which OCFS typically schedules several months later. OCFS's Bureau of Special Hearings then waits until the initial conference is conducted before setting a date for the Fair Hearing, which it typically schedules for several more months out, rather than provide the parent both dates simultaneously at some set interval, such as scheduling the Fair Hearing two weeks after the initial conference date.

142.    A significant percentage of cases settle at the Fair Hearing stage, but only after the parent has waited until the Fair Hearing date, like in Ms. Voe's case. Initial conferences are not typically conducted in a way that encourages efficient resolution of meritless cases. For example, implementing policies that promote earlier resolution of SCR appeals via settlement, or more

prompt disclosure of CPS's investigative records, would free up the ALJs' dockets, resulting in timelier resolution of those cases that proceed to Fair Hearing.

## CLASS ACTION ALLEGATIONS

143.    Plaintiffs seek to represent a certified class pursuant to Rule 23(b)(2), or, in the alternative, Rule 23(b)(1), of the Federal Rules of Civil Procedure on behalf of themselves and all persons similarly situated consisting of:

> All persons (A) who are or will be subject to a Statewide Central Register background check; (B) who are or will be listed on the Statewide Central Register as subjects of reports of child abuse or maltreatment that were or will be investigated and deemed indicated by a designated Child Protective Services agency; (C) who timely requested or will timely request amendment or sealing of their indicated reports; and (D) whose requests for amendment or sealing have not been finally decided (the "Class").

144.    This action is properly maintainable as a class action because all four requirements of Federal Rule of Civil Procedure 23(a) are satisfied.

145.    <u>Numerosity</u>.  The members of the Class are too numerous to be joined in one action, and their joinder is impracticable.  In the past ten years, more than 30,000 reports have been indicated each year.  OCFS data show that from 2020 through mid-2025, over 8,000 people waited longer than a year for a decision at the administrative review stage.  Over 4,800 people waited at least an entire year after the administrative review to receive a Fair Hearing decision.  As such, the Class contains thousands of people.

146.    <u>Commonality</u>.  There are numerous questions of law and fact common to the Class, including:  (i) whether OCFS maintains a widespread policy, custom, or practice of lengthy delays in conducting administrative reviews and Fair Hearings, and issuing Fair Hearing decisions (the "Delays"); (ii) whether Defendants have actual or constructive knowledge of the Delays caused by OCFS's policies, customs, or practices; (iii) whether Defendants have failed to establish adequate policies or procedures to protect the Fourteenth Amendment rights of individuals who

request that indicated reports be amended or sealed through the SCR appeal process; (iv) whether Defendants have failed to adequately train and supervise employees to ensure the timeliness of the SCR appeal process; (v) whether Defendants fail to maintain policies relating to, or adequately train and supervise staff about, parents' Fourteenth Amendment due process rights during administrative reviews and Fair Hearings; (vi) whether the Delays cause harm to class members; and (vii) whether Defendants violated the Fourteenth Amendment due process rights of class members through the Delays.

147.    <u>Typicality</u>.  The violations and injuries suffered by Plaintiffs are typical of those suffered by members of the Class.  Like all members of the Class, Plaintiffs (i) have been or will be listed on the SCR as subjects of indicated reports; (ii) have timely requested or will timely request amendment of the indicated reports; (iii) have been waiting or will wait for a final decision on their request for amendment; and (iv) have been or will be working, desire to work, or be licensed in employment requiring an SCR background check, or desire to be licensed as foster or adoptive parents.

148.    <u>Adequacy</u>.  Plaintiffs and their counsel will adequately and fairly protect the interests of all members of the Class.  Plaintiffs' interests are consistent with those of the Class members.  There are no conflicts of interest between Plaintiffs and the Class members in that all would benefit if Defendants are ordered to cease the policy, custom, and practice that causes the unconstitutional deprivation of Plaintiffs' and the Class's due process rights through significant delays in the SCR appeal process.  In addition, counsel for Plaintiffs are experienced in class action and civil rights litigation and have significant knowledge of OCFS's conduct in processing SCR requests for amendment of indicated reports.

149.    This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted on grounds that apply generally to the Class, in that each member of the Class is harmed by, or is at risk of harm from, violations of the same Fourteenth Amendment right to due process.  Accordingly, final injunctive relief to bring OCFS's policies and practices regarding the processing of requests for amendment of indicated reports into compliance with the Fourteenth Amendment is appropriate as to the Class as a whole.

150.    In the alternative, this action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(b)(1) because prosecuting actions by individual class members would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants.

## CAUSE OF ACTION

### 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT – PROCEDURAL DUE PROCESS (ALL PLAINTIFFS, ON BEHALF OF THEMSELVES AND ALL OTHER SIMILARLY SITUATED, AGAINST DEFENDANTS HARRIS-MADDEN, CONNOLLY, AND GLEESON IN THEIR OFFICIAL CAPACITIES)

151.    Plaintiffs repeat and re-allege the allegations in Paragraphs 1 through 150 above.

152.    Defendants Harris-Madden, Connolly, and Gleeson are responsible for a policy, custom, or practice of significant delays—regularly a year or more—in appeals seeking to amend or seal indicated SCR reports.  These significant delays deprive Plaintiffs and others similarly situated of their constitutionally protected interests in obtaining employment and fostering or adopting children, inflict dignitary harms, and deny them a meaningful and timely opportunity to be heard.

153.    Defendants' significant delays in the SCR appeal process violate the Fourteenth Amendment to the United States Constitution, which prohibits the deprivation of "life, liberty, or

property without due process of law."  The right to challenge indicated reports implicates Plaintiffs' protected liberty interests.  *Valmonte* v. *Bane*, 18 F.3d 992, 999, 1002 (2d Cir. 1994).

154.    Defendants' policy, custom, or practice of significant delays presents a serious risk of erroneous deprivation of Plaintiffs' liberty interests given that the vast majority of individuals who challenge their inclusion on the SCR through the SCR appeal process prevail.  By failing to address the significant delays in the SCR appeal process, Defendants, acting under the color of state law, have directly and proximately caused deprivations of the protected liberty interests of Plaintiffs and others similarly situated.

155.    At all relevant times, Defendants Harris-Madden, Connolly, and Gleeson were aware of the widespread and persistent pattern of extreme and unreasonable delays in adjudicating challenges to indicated reports.

156.    At all relevant times, Defendants Harris-Madden, Connolly, and Gleeson were responsible for, and had the ability to redress, the extreme delays in adjudicating challenges to indicated reports.

157.    At all relevant times, Defendants Harris-Madden, Connolly, and Gleeson failed to redress the persistent pattern of extreme and unreasonable delays in adjudicating challenges to indicated reports that amounted to a constructive acquiescence to such delays.

158.    Defendants' constructive acquiescence constitutes a policy, custom, or practice of extreme and unreasonable delays in adjudicating challenges to indicated reports.

159.    The persistent pattern of extreme and unreasonable delays in adjudicating challenges to indicated reports is a result of Defendants' policy or custom of failing to train or supervise their subordinates that amounts to a deliberate indifference to the constitutional rights of the Plaintiffs and members of the Class, and a deliberate indifference to the delays.  Defendants'

failure to properly train OCFS's staff on the proper standards of review is confirmed by the high rate at which indicated reports are amended or sealed on appeal. OCFS routinely fails to supervise its staff to ensure timely processing of Fair Hearing requests, leading to due process violations.

160.    Plaintiffs are harmed by Defendants' constructive acquiescence and/or Defendants' deliberate indifference. Defendants continue to subject Plaintiffs to their unconstitutional policy, custom, or practice in areas in New York in which Plaintiffs currently reside. Thus, a real or immediate threat exists that Plaintiffs' Fourteenth Amendment rights will be violated by Defendants in the future.

161.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their rights unless Defendants are enjoined from continuing OCFS's unconstitutional policy, custom, and practice causing significant delays in processing SCR appeals.

162.    As a result of the violations described herein, Plaintiffs and others similarly situated suffered harms and are entitled to injunctive and declaratory relief, costs, and attorneys' fees.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court:

1.    Certify this action as a class action on behalf of the proposed class pursuant to Rule 23(b)(2), or, in the alternative, Rule 23(b)(1), of the Federal Rules of Civil Procedure, with the Plaintiff class consisting of:

> All persons (A) who are or will be subject to a Statewide Central Register background check; (B) who are or will be listed on the Statewide Central Register as subjects of reports of child abuse or maltreatment that were or will be investigated and deemed indicated by a designated Child Protective Services agency; (C) who timely requested or will timely request amendment or sealing of their indicated reports; and (D) whose requests for amendment or sealing have not been finally decided (the "Class").

2.      Enter judgment against Defendants declaring that Defendants' policy, custom, and/or practice of significant SCR appeal delays, and failure to train and supervise, deprive Plaintiffs of their rights under the Fourteenth Amendment to the United States Constitution;

3.      Grant appropriate permanent equitable and injunctive relief to remedy Defendants' unconstitutional policy, custom, and practice of significant delays in the SCR appeal process;

4.      Award Plaintiffs reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

5.      Grant such other and further relief as the Court may deem just and proper.

Dated: February 24, 2026
         New York, NY

                                                    Respectfully Submitted,

/s/ *Suhana S. Han*                                 /s/ *David Shalleck-Klein*
Garrard R. Beeney                                   David Shalleck-Klein
(*beeneyg@sullcrom.com*)                            (*dshalleckklein@fjlc.org*)
Suhana S. Han (*hans@sullcrom.com*)                 Lewis Bossing (*lbossing@fjlc.org*)
Jessica M. Klein (*kleinj@sullcrom.com*)            Sarah Ortlip-Sommers
Stella S. Meyer (*meyerste@sullcrom.com*)           (*sortlipsommers@fjlc.org*)
Aneesa Mazumdar                                     Phoenix Rice-Johnson
(*mazumdara@sullcrom.com*)                          (*pricejohnson@fjlc.org*)
SULLIVAN & CROMWELL LLP                             FAMILY JUSTICE LAW CENTER
125 Broad Street                                    183 Madison Avenue, Suite 419
New York, N.Y. 10004-2498                           New York, N.Y. 10016
Telephone: (212) 558-4000                           Telephone: (212) 223-6939

/s/ *Lucas S. Marquez*                              /s/ *Tehra Coles*
Lucas S. Marquez (*lmarquez@bds.org*)               Tehra Coles* (*tcoles@cfrny.org*)
Lauren Shapiro (*lshapiro@bds.org*)                 Christine Waer* (*cwaer@cfrny.org*)
Alyssa Briody (*abriody@bds.org*)                   Melissa Lombreglia*
BROOKLYN DEFENDER SERVICES                          (*mlombreglia@cfrny.org*)
177 Livingston Street, 7th Floor                    CENTER FOR FAMILY REPRESENTATION
Brooklyn, N.Y. 11201                                40 Worth Street, Suite 605
Telephone: (718) 254-0700                           New York, N.Y. 10013
                                                    Telephone: (212) 691-0950

/s/ *Christine Gottlieb*
Christine Gottlieb*
(*gottlieb@mercury.law.nyu.edu*)
NYU SCHOOL OF LAW FAMILY DEFENSE
CLINIC / WASHINGTON SQUARE LEGAL
SERVICES, INC.
245 Sullivan Street, 5th Floor
New York, N.Y. 10012
Telephone: (718) 374-1364

*\*pro hac vice* forthcoming

                        *Attorneys for Plaintiffs*

Aditi Fruitwala* (*afruitwala@aclu.org*)
Viviana Bonilla López*
(*vbonillalopez@aclu.org*)
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION
915 15th Street NW
Washington, DC 20005
Telephone: (212) 549-2500

*pro hac vice* forthcoming

Jessica Perry (*jperry@nyclu.org*)
Gabriella Larios (*glarios@nyclu.org*)
NEW YORK CIVIL LIBERTIES UNION
  FOUNDATION
125 Broad Street, 19th Floor
New York, NY 10004
Telephone: (212) 607-3300

*Of Counsel*